This case involves plaintiff Larry Cook's claim that he incurred two injuries by accident on June 22, 1994 and July 19, 1994, which caused him to develop a disease, post traumatic stress disorder. Plaintiff's claim was heard in Raleigh before Deputy Commissioner Jan Pittman, who in a May 8, 1977 Opinion and Award denied plaintiff's claim. Plaintiff appealed that denial and a majority of the reviewing panel affirmed the Deputy Commissioner's decision.
Plaintiff's claim rests on his development of a psychiatric disorder following his experience of workplace trauma. Although the Deputy's Opinion and Award properly found that plaintiff had experienced two accidents that could have caused his posttraumatic stress syndrome, the Deputy Commissioner, and a majority of the reviewing panel on appeal, erred in placing greater weight on the testimony of medical experts with no expertise in psychiatric disorders and who spent far less time evaluating plaintiff than plaintiff's expert.
Prior to the hearing, the parties submitted a pretrial agreement containing standard stipulations. At the hearing, the parties stipulated that the plaintiff worked for the employer at a Glaxo site on June 22, 1994 moving fume hoods, and July 19, 1994 at a trailer. At the hearing, Larry Cook, Mary Cook, defendant-employer's operations manager Tom Carey, and Emmanuel Mathews testified for the plaintiff. Lynn Whitley, Julia Lambeth and Jyl Burgener testified for the defendants. After the hearing, plaintiff took the deposition of Dr. Sheldon Chase and defendants took the depositions of Dr. Scott Spillman, Dr. Thomas Gualtieri and Dr. Dennis Darcey.
Plaintiff Larry Cook is a 43 year old man who began working for Security Storage in October 1993 as a truck driver and mover. Prior to 1993, plaintiff never had a history of any problems with major accidents or with any emotional illness or depression.
While working for defendant-employer, on occasion plaintiff was assigned to perform work at Glaxo facilities. On June 22, 1994, plaintiff was required to move large fume hoods (also called biological safety cabinets) from one site and help set them up. When the first hood was plugged in, it kicked off a strong odor that caused everyone present to leave the room. The odor caused plaintiff to choke and gag for about ten minutes so that he couldn't breathe. Plaintiff eventually helped set up all the hoods, and each time the hood was plugged in it set off fumes that caused him to choke. Plaintiff had not been warned about the strong odors and had no protective equipment. Plaintiff's throat was sore and he had headaches for several days afterwards but his problems resolved and he did not see a doctor.
On July 19, 1994, plaintiff returned to Glaxo where his crew was involved in loading furniture and other items onto a trailer, while another crew was unloading equipment from another trailer that had been fumigated. The morning was very hot. When the doors to plaintiff's trailer were opened, strong fumes came out that smelled like the odors plaintiff smelled on June 22 but were much stronger. After about ten minutes, plaintiff picked up furniture from a loading dock and started loading it on the trailer. As he did this, he felt his throat burning and a choking sensation and started gagging. He left the trailer but was still gagging and thought he was dying. Witnesses observed plaintiff's extreme reaction.
Two other witnesses testified to corroborate plaintiff's account of the accident. Tom Carey, the operations manager for defendant, arrived shortly after the trailer doors were opened. Carey corroborated that plaintiff was sweating, gagging, wheezing and heaving and testified that he knew plaintiff to be a truthful man and did not believe his symptoms were exaggerated. Carey smelled a formaldehyde odor. He testified that the chemicals used inside the trailer included paraformaldehyde, benzylkonium chloride, and a quatricide. Emanuel Mathews, a co-worker during the trailer operation, entered one of the trailers being unloaded on July 22 and, just as plaintiff had, smelled a strong gas that caused him to have burning eyes, choking, and difficulty breathing.
Plaintiff was taken to the Glaxo clinic. About two and a half hours later, he felt better, left the clinic, and returned to his work area, where he smelled fumes again, began gagging, and returned to the clinic.
Defendant offered testimony of a Glaxo employee, Jyl Burgener, regarding a fumigation process at Glaxo. Burgener worked for Glaxo as an industrial hygienist, even though she was only educated in animal nutrition.
According to Burgener, the biological safety cabinets were used by scientists doing experiments with biological agents. The cabinets have filters used to trap organic matter in which vapors and can build up. The cabinets had been decontaminated before the move with a chemical fumigation process that used ammonia and paraformaldehyde. Formaldehyde gas and hexymethylenetetramine were formed during this process. The decontamination would have killed the organic matter in the filters, which could have had a very strong odor that could make a person choke. The cabinets were not tested for gas buildup but Burgener testified that a chemical residue could be left in the cabinets, and that plugging in the hoods, as plaintiff did, could create a strong odor that could have made plaintiff choke and gag the way he described.
A similar chemical fumigation process had previously been used by Glaxo in the trailer that plaintiff entered. Burgener described a similar situation where that trailer had previously and unexpectedly off-gassed formaldehyde and injured Security Storage workers, despite having been tested for formaldehyde just before the workers entered. The trailer had been used to decontaminate lab furniture in spring 1994. Testing was later done and there appeared to be no formaldehyde present, but shortly after the testing, on May 12, 1994 several Security Storage workers entering that trailer inhaled formaldehyde vapor and had to go to the Glaxo clinic as a result. Burgener admitted that formaldehyde is absorbed by porous material such as wood, paper, cotton or wallboard, and that the trailer contained such porous material. Burgener admitted that formaldehyde could unexpectedly "off-gas" from porous material long after it initially had been absorbed.
The day before plaintiff entered that very same trailer that had off-gassed earlier, Burgener did air testing for formaldehyde and ammonia using a dragger pump. No abnormal reading was found. Burgener briefly entered the trailer the morning of the incident, before the summer heat built up, and claimed to have examined for holes in the plastic lining meant to seal off the porous trailer walls. Burgener only checked the walls, could not examine the high ceiling closely, and only had early-morning light from a door at one end of the trailer. Sometime after plaintiff became sick on July 19, she retested the trailer for the same gases and found nothing. Burgener did not know how soon she tested the trailer after plaintiff entered it.
After the second accident, plaintiff returned to work the next day but his throat was sore and burning and he had a headache. Over the next several weeks, he began to develop pains in his body. He had pains in his eyes and burning in his throat around diesel fumes. He felt weak and disoriented and was afraid he was going to die. Plaintiff later was given office work but eventually decided not to continue to work because of his symptoms and his fears the company would not take care of him.
Over the next several months, plaintiff began experiencing reactions to strong smells, such as cologne, soap, disinfectants and burning charcoal, which make him gag. He has had nightmares about what happened to him at Glaxo, as well as other nightmares about loss of control over situations. He also has had physical problems, such as pains in his joints and teeth, problems with extreme heat and cold, and skin sensitivity. His mood became very down and he feels like a "dead man" and has constant fears about dying. He has fears about what the chemicals he was exposed to can do to him. Plaintiff feels something, "is not right" in his throat. Later he felt he had swollen areas on top of his head. Plaintiff never had any of these symptoms before the accidents. He began to use a paper mask to try to keep his teeth warm and avoids going outside. On a typical day he does very little (in order to avoid the weather, smells, and other people). He smokes cigarettes still but testified that the smell does not bother him. Plaintiff's wife corroborated these complaints and changes in behavior.
The MSDS sheet for the quatricide used in the fumigation process lists as side effects eye and skin irritation and nausea and vomiting on inhalation. The MSDS sheet for hexymethylenetetramine states that on acute exposure the chemical can cause imitation of mucous membranes with coughing and shortness of breath. The MSDS sheet for paraformaldehyde lists the chemical as toxic by inhalation and in skin contact; recommends use of personal protective equipment; and lists acute affects as including a burning sensation, coughing, wheezing, shortness of breath, headache, nausea and vomiting. The MSDS sheet for benzylkonium chloride lists eye, skin and respiratory tract irritation on acute exposure.
During the fall of 1994, plaintiff was seen at an Urgent Care clinic. He later was referred to Dr. Darcey at Duke, and on October 28, 1994, plaintiff was seen by Dr. Kredich at Duke. At that time plaintiff had elevated laboratory readings which Dr. Kredich believed might have been related to the chemical exposure. Plaintiff later was evaluated by Dr. Chase, Dr. Spillman, and Dr. Gualtieri.
Plaintiff was evaluated over three different sessions by Dr. Sheldon Chase, a Raleigh psychiatrist. Dr. Chase conducted three sessions with plaintiff. Dr. Chase obtained a detailed history from plaintiff and found that he gave symptoms of post traumatic stress disorder ("PTSD"), but not of social phobia, panic disorder of excessive-compulsive disorder. Dr. Chase reviewed plaintiff's medical records from other providers. He diagnosed major depressive disorder and PTSD.
PTSD is a psychiatric disorder, according to the DSM-IV, with four criteria. First, the person must experience "exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury" or other threat to one's physical integrity. The traumatic event need not actually be life threatening. (emphasis added) Then, after a period of usually about three months, the person begins to experience symptoms particular to PTSD, which consist of the second through fourth criteria of the disorder: persistent reliving the experience of the trauma, which can involve re-experiencing physical symptoms of the event upon reminder of it with intense psychological distress; persistent avoidance of situations that remind the person of the event, including "phobic, avoidance of activities that remind the person of the original trauma that can result in loss of a job, feelings of numbness, and diminished interest in daily activities; and persistent symptoms of increased arousal, including anxiety and nightmares.
In Dr. Chase's view, plaintiff's accidents were a significant traumatic event for him, in that he believed he was going to die during the acute exposure.
Plaintiff exhibited characteristic symptoms after the accidents, including persistent sensitivity to strong chemical odors such as cologne or Clorox triggering him to relive his experience of choking and gagging; persistent avoidance of those reminders, such as by not leaving his house and wearing a mask; and recurrent dreams and nightmare of the event, or of being sick or hospitalized, or otherwise not being in control.
Dr. Chase testified that the two accidents at work were the cause of plaintiff developing the PTSD. Dr. Chase came to this opinion assuming that plaintiff had an exposure to a strong odor which caused him to have the severe gagging, choking, throat burning and the feeling that he would die, regardless of whether that odor were caused by formaldehyde or another compound, including decaying organic matter. Dr. Chase's opinion was that the compound plaintiff smelled need not have any long-term, toxic physical effects. The first incident by itself, if it were experienced as life threatening, could have been sufficient to trigger the PTS. Dr. Chase's opinion is that plaintiff's symptoms make him unable to work because of his symptoms. Plaintiff requires medical treatment, including counseling, medication, and encouragement to resume contact with his world.
On January 2, 1996, Jim Miller, Ph.D., performed an independent examination for disability for the North Carolina Disability Determination Services. Dr. Miller performed a "comprehensive mental status evaluation" and also diagnosed PTSD with major depression. Dr. Miller found Plaintiff to be oriented but depressed and anxious, and stated that he needed therapy.
Plaintiff saw several doctors upon the referral of defendants: Dr. Darcey, Dr. Spillman, and Dr. Gualtieri. Dr. Darcey, an occupational medicine specialist, saw plaintiff on October 19, 1994. His opinion was that formaldehyde could cause symptoms similar to those plaintiff experienced following his exposures, and that his acute symptoms could have related to hyperreactive airways. Dr. Darcey's opinion was that plaintiff's long-term symptoms were not related to the "direct toxic effects" of his exposure but suggested that exposure to toxic agents can "cause
an anxiety syndrome that resembles post-traumatic stress disorder" leading to somatic complaints, which could explain plaintiff's condition.
At his deposition, Dr. Darcey admitted that he "was not an expert on post-traumatic stress syndrome by any means." He had limited experience, he had not read the literature on PTSD or questioned plaintiff about dreams or other re-experiencing of the trauma, and he would defer to psychiatric opinion.
On June 27, 1995, Dr. Scott Spillman did an IME of plaintiff for the defendants. Dr. Spillman is not a specialist in psychiatry, is not board certified in occupational medicine, and usually does evaluations for employers. Dr. Spillman's evaluation also found nightmares, avoidance, and fear on plaintiff's part. He assessed a history of exposure to formaldehyde and was "unable to comment" on whether there was PTSD. Dr. Spillman concluded that formaldehyde exposure contributed to plaintiff's immediate symptoms but not his long-term problems, which Dr. Spillman recommended be handled by a "mental health professional."
At his deposition, Dr. Spillman again stated in response to defendants' hypotheticals that the chemical exposure would not have caused long term organic (or physically toxic) health effects. Dr. Spillman's examination was geared toward evaluating organic, physical problems and he did not reach firm conclusions regarding a psychiatric basis for the symptoms. Dr. Spillman agreed that the triggering event for PTSD need not actually be life threatening, felt it was possible that plaintiff had PTSD but felt he needed further testing to reach an opinion.
On April 17, 1996, defendants had plaintiff examined by Dr. Thomas Gualtieri, a psychiatrist. Dr. Gualtieri is a specialist in head injuries and not PTSD. Dr. Gualtieri could not diagnose plaintiff's condition, but did state that he did not believe plaintiff has PTSD, based on the fact that his chemical exposures were not severe enough and his symptoms were not specific to PTSD.
Dr. Gualtieri's opinions are less credible than those of Dr. Chase. Dr. Gualtieri stated that plaintiff's possible diagnoses were hysteria, malingering and compensation neurosis. The malingering diagnosis was directly contradicted by Dr. Gualtieri's own testing, which found no evidence of exacerbation or malingering. Dr. Gualtieri did not know what plaintiff's actual accidents at Glaxo involved and was not able to establish a chronology of when plaintiff developed different problems. Although Dr. Gualtieri's office saw plaintiff two to three hours, much of that time was spent administering a battery of standardized tests. Dr. Gualtieri admitted he needed more time spent interviewing plaintiff to come to a definite diagnosis.
The Opinion and Award found that the testing is done after fumigation of the safety cabinets to ensure no harmful gases remain. (Finding of Fact 4) It found that on June 22, 1994, an odor was released from the cabinets causing plaintiff to gag (Finding of Fact 5); and that on July 19, when the trailer was opened, plaintiff noticed fumes and felt burning and choking. (Finding of Fact 8) However, the Opinion and Award found that Dr. Darcey found plaintiff's complaints were not causally related to the incidents at Glaxo (Finding of Fact 11); that Dr. Spillman did not think plaintiff had PTSD and that his exposure could not have caused PTSD (Finding of Fact 12); and that Dr. Gualtieri found malingering and that plaintiff did not have PTSD. (Finding of Fact 13 and 14) The Deputy and panel majority further found that plaintiff does not have PTSD related to his accidents. (Finding of Fact 17) Based on these findings, the Deputy and majority of the reviewing panel concluded that plaintiff had sustained accidents on June 22 and July 19, 1994, causing respiratory distress, but that he did not suffer an injury. (Conclusion of Law 1) They further concluded that the evidence did not show that the exposure "caused" the development of a compensable occupational disease; and that if plaintiff did have exposure, his injury only lasted two or three hours. (Conclusion of Law 4).
PLAINTIFF HAS A COMPENSABLE POST-TRAUMATIC STRESS DISORDER CAUSED BY HIS ACCIDENTS WORKING FOR DEFENDANT-EMPLOYER.
There is no dispute, and the Deputy and majority accepted, that plaintiff suffered two injuries by accident in 1994 at Glaxo. Plaintiff here is not claiming that his accidents caused an organic disorder causing the symptoms he suffers. Instead, plaintiff is contending that his experience during the accidents was sufficiently traumatic to cause PTSD, and that his correct diagnosis is PTSD related to the accidents.
First, plaintiff suffered more than "temporary respiratory distress" as a result of the accidents. Plaintiff testified without dispute that he suffered severe choking, gagging, wheezing and difficulty breathing and thought he would die. His supervisor Tom Carey testified that plaintiff is honest and that he himself observed plaintiff in that condition. Plaintiff is not an educated man and clearly felt that his unexpected encounters were frightful and deadly, and there is no evidence to the contrary.
Plaintiff's level of stress caused by his exposures and his overall presentation met the diagnostic criteria for PTSD, as Dr. Chase and Dr. Miller concluded. Dr. Chase and Dr. Miller, both mental health experts, concluded that plaintiff has post-traumatic stress disorder that resulted from his exposures. Dr. Miller was an independent evaluator and was not chosen by either side.
Dr. Chase's evaluation should have been given far more weight than the other doctors hired by the defendant. Drs. Spillman and Darcey readily acknowledged that they are not experts in psychiatry and do not have the expertise to perform a psychiatric diagnosis. In comparison to Dr. Gualtieri, Dr. Chase spent several sessions carefully interviewing plaintiff and observing him. As Dr. Gualtieri recognized, the most important way to diagnose plaintiff was by doing extensive interviewing. Dr. Chase did that interviewing. Dr. Gualtieri only relied instead on standardized forms and tests.
Dr. Gualtieri's interview was so inadequate that he was not even able to understand what the traumas were that plaintiff experienced that might have led to the PTSD. Dr. Gualtieri was nonetheless able to rule out PTSD without even knowing the nature of plaintiff's accidents. In this second respect, then — understanding plaintiff's history — Dr. Chase's diagnosis is superior to Dr. Gualtieri. Dr. Gualtieri was convinced that plaintiff's trauma was insufficient to amount to PTSD, yet he did not even know what happened to plaintiff in order to state the factual basis of his opinions. (Gualtieri depo p. 27-28)
Dr. Chase was correct that plaintiff's experience when he had the accidents and inhaled the chemicals was sufficient to establish a significant traumatic event that could trigger PTSD. The DSM-IV only requires that the event be life threatening, or threaten one's physical integrity. Dr. Chase testified that the victim must have a subjective belief that he would die. The evidence is undisputed that plaintiff had that belief. Dr. Gualtieri — contrary to the DSM IV — insisted that the patient's experience had to involve an incident that actually could kill or harm him. Dr. Gualtieri's own standard, however, would exclude from the diagnosis anyone who faced only a "threat" of harm and is clearly contrary to the DSM IV, which includes "threats" Dr. Gualtieri also undercut his own position by postulating that a sufficient trauma could include being enclosed in a room for a long period of time. (Gualtieri depo pp. 6, 31)
Finally, plaintiff's consistent reporting of symptoms at the hearing and to his doctors supports the rest of the diagnostic criteria for PTSD. Dr. Chase's testimony draws out how plaintiff's symptoms of nightmares, hyperreaction to strong chemical smells, avoidance of heat and odors, and lethargy form the basis of the PTSD diagnosis. Mr. Cook, upon encountering heat chemical smells that remind him of the Glaxo smells, reexperiences the same or similar physical symptoms he felt in 1994. The fact that plaintiff does not get similar symptoms from cigarette smoke does not undermine his credibility, since cigarette smoke is not a pungent solvent, unlike Clorox, cologne, and other vapors that bother plaintiff. In addition, as Dr. Spillman recognized, cigarettes are addictive, which helps explain plaintiff's continual use of them. (Spillman depo p. 92)
My vote is to REVERSE.
This 27th day of April 1998.
 S/ ____________ THOMAS J. BOLCH COMMISSIONER